# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GERRY HUMMELL,
*as personal representative of the*
*Estate of Lance Hummell,*

      Plaintiff,

v.                                      CIV 11-765 GBW/WPL

HORACIO RIVERA,
CITY OF LAS CRUCES,

      Defendants.

## MEMORANDUM OF DECISION

This matter comes before the Court on Plaintiff's Proposed Findings of Fact and Conclusions of Law and Pretrial Memorandum (*docs. 91, 98, 110*), Defendants' Proposed Findings of Fact and Conclusions of Law (*docs. 79, 106*), and the bench trial held in this case on April 8-9 and 11, 2013.  Pursuant to Federal Rule of Civil Procedure 52, the Court herein sets forth its findings of fact, conclusions of law, and decision.  Because the Court finds that Lance Hummell's constitutional rights under the Fourth Amendment were not violated, nor was Defendant Rivera negligent when he shot Lance Hummell, judgment in favor of the Defendants will be entered.

## I.    INTRODUCTION

This case concerns the fatal shooting of Mr. Lance Hummell by Las Cruces Police Department Officer Horacio Rivera on July 13, 2010.  Plaintiff brought suit on behalf of Mr.

Hummell's estate alleging that Mr. Hummell's death was the result of excessive force in violation of Plaintiff's Fourth Amendment rights and/or the result of tortious negligence on the part of Defendant Rivera.  Plaintiff further alleged that the violation of Mr. Hummell's constitutional and common law rights resulted in part from the City of Las Cruces' failure to train and supervise Officer Rivera.

On April 8-9 and 11, 2013, the Court held a bench trial on these issues.  Having heard witness testimony, reviewed the parties' exhibits accepted into evidence at trial, heard Plaintiff's and Defendants' respective arguments, and reviewed the trial pleadings and relevant law, the Court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

## II.   FINDINGS OF FACT

For the significant disputed facts, in subparts under the numbered facts, the Court addresses the most critical evidence upon which the finding is based and why certain potentially contradictory evidence was rejected.

1. Plaintiff, Gerry Hummell, is the father of the decedent, Lance Hummell ("Mr. Hummell"), and the personal representative of Mr. Hummell's Estate.

2. Defendant Horacio Rivera ("Officer Rivera") was, at the time of the incident, a police officer employed by the Las Cruces Police Department (LCPD).

3. Officer Rivera is sued in his official and individual capacities.

4. Defendant City of Las Cruces is the municipal governmental entity that controls the Las Cruces Police Department.

5. Mr. Hummell broke up with his girlfriend, Brittney Burgess ("Burgess"), on July 12, 2010.

6. On the morning of July 13, 2010, Mr. Hummell exchanged several text messages with Burgess.  In those text messages, Mr. Hummell made the following statements (in their original wording):

   a. "I hope you can handle my death on ur conscience."

   b. "I am im writing my suicide letter."

   c. "Nope ull just backstab my later. This is final goodbye, u should say something good for the record so when they find my phone u won't b seen in such light."

   d. "Since i dont have a gun itl have 2 b death by cop i guess. Im too weany to use my sword."

7. At some point on the morning of July 13, 2010, Mr. Hummell wrote a suicide note in which he stated "I now have nothing left to live for in this life. . . . I hope [Brittney Burgess] can live with [her]self knowing [she] was the death of me. Good bye everyone. . . . I'm sorry."

8. At some point on the morning of July 13, 2010, Mr. Hummell placed himself and a four foot long sword in a vehicle in the parking lot on the north side of the Mesilla Manor Apartments.  The location of the vehicle is noted in the diagram identified as the Court's Appendix.

9. At 8:27 a.m. on July 13, 2010, the Mesilla Valley Regional Dispatch Authority ("MVRDA") received a call from an individual who identified himself as "Lance".  The caller stated that there was a man wearing an orange shirt and carrying a large sword at 1101 E. Boutz

Road, the Mesilla Manor Apartments.  The caller described the man as raving.  It was later

determined that the caller was Mr. Hummell.

10. The MVRDA recorded the call as coming from (505) 709-0070.  This phone number

    belonged to Mr. Hummell.

11.  The MVRDA dispatched two LCPD vehicles to the scene: Units 636 and 701, belonging to

    Officers Dennis Camp and Rivera, respectively.  Dispatch advised the officers that there

    was a man wearing an orange shirt carrying a large sword at 1101 E. Boutz Road, the

    Mesilla Manor Apartments.  Dispatch advised the officers that the man was "irate" or

    "raving."

12. Officer Camp arrived at the scene first and parked on Montana Street at the curb of the

    Mesilla Manor Apartments parking lot, near the intersection of Montana Street and

    Alamo Street.[1]

13. Officer Rivera arrived at the scene at 8:32 a.m. and parked on Montana Street on the curb

    opposite from the Mesilla Manor Apartments, somewhat further from the intersection of

    Montana Street and Alamo Street.[2]

14. Officer Camp walked over to Officer Rivera's vehicle.  Both were in uniform.

15. Officer Rivera armed himself with an AR-15 rifle, which is a semi-automatic assault rifle.

    His rifle was slung over his shoulder such that it hung directly in front of his body.

    Officer Camp was armed with a handgun.

---

[1] Marked as "P1" on Court's Appendix.
[2] Marked as "P2" on Court's Appendix.

16. Officers Camp and Rivera had a brief conversation and then approached the Mesilla Manor Apartments.  At the time that Officers Camp and Rivera were approaching the Mesilla Manor Apartments, Evelyn Terry was in her apartment on Alamo Street, in Las Cruces.   Ms. Terry's apartment was located across the street, at a diagonal, from the parking lot in front of the entrance of the Mesilla Manor Apartments.  Ms. Terry can see the parking lot of the Mesilla Manor Apartments from a window in the bedroom of her apartment.  Ms. Terry was not looking out at the parking lot of the Mesilla Manor Apartments prior to the first shot being fired.

17. Immediately prior to the incident, Hector Gonzales was driving along Alamo Street.  He was performing a stop at the stop sign located at the intersection of Alamo Street and Montana Street at the time of the incident. From where he was stopped, Mr. Gonzales could see the Mesilla Manor Apartments parking lot.  There was a car in between Mr. Gonzales and where Mr. Hummell was standing such that, from his position at the stop sign, Mr. Gonzales could only see Mr. Hummell "from the shoulder up."  Mr. Gonzales did not observe the interaction between the officers and Mr. Hummell until, at the earliest, moments before the first shot was fired.

18. As Officers Camp and Rivera approached the entrance to the Mesilla Manor Apartments,[3] Officer Rivera observed someone sitting in a blue car parked to the right of the entrance.[4] The officers were interested in talking to the individual because he or she may have seen the person with the sword.

---

[3] Marked as "Complex Entrance" on Court's Appendix.
[4] Marked as "V2" on Court's Appendix.

19. The officers altered direction from walking to the apartment complex entrance and

    moved towards the blue vehicle with the potential witness.  After the officers had passed

    the rear left corner of the nearby white vehicle[5], the door to the blue vehicle opened.  At

    this time, Officer Rivera was positioned somewhere within the oval marked "Rivera" on

    Court's Appendix.  Officer Camp was positioned somewhere within the oval marked

    "Camp" on Court's Appendix.

    a.  Not only is this finding regarding the positioning Officers Rivera and Camp based

        upon the consistent trial testimony of both officers; it is also consistent with the

        location of the shell casings found at the scene[6] and the fact that the officers had been

        moving toward the complex entrance but turned toward the blue vehicle upon

        observing an occupant.  Ms. Terry testified that, after the first shot was fired, the

        officers were standing at the curb along Montana Avenue near Officer Camp's police

        cruiser.  This location would place Officer Rivera considerably further away from Mr.

        Hummell and at a different angle.  This testimony, however, is inconsistent with the

        testimony of Officers Rivera and Camp, and, most conclusively, with the location of

        the shell casings.  A number of factors may have contributed to Ms. Terry's mistaken

        recollection, for example: (1) the angle and distance from which she observed the

        event; (2) the fact that her observation began only after at least one and perhaps three

        shots were fired; or (3) the sheer shocking nature of the incident.  In any event, the

---

[5] Marked as "V1" on Court's Appendix.
[6] Marked as "Shell Casings" on Court's Appendix.  It is undisputed that Officer Rivera's rifle had a right-facing
ejection port.  Consequently, casings will be ejected to the right, and, according to undisputed testimony,
slightly to the rear of the rifle when fired.

Court does not credit Ms. Terry's testimony as to where Officers Rivera and Camp were standing when they confronted Mr. Hummell.

   b.  Mr. Gonzales was unable to give any precise testimony regarding the location of the officers.

20.  Based on this finding regarding Officer Rivera's location, he was located as close as 18 feet and not more than 27 feet from Mr. Hummell when Mr. Hummell exited the blue vehicle.

   a.  These distance calculations are based upon the undisputed fact that the width of each parking space was 9 feet.

   b.  These calculations are also consistent with the measurements as calculated in Plaintiff's Exhibit 7.

21.  After Mr. Hummell opened the driver's side door of the blue vehicle from the inside, he leaned down and withdrew a four foot long samurai-style sword from the vehicle's interior.  He then exited the vehicle and pulled the sword up in front of him.  Mr. Hummell, who was approximately six feet, three inches tall, held the sword tip skyward with the sharp side of the blade facing the officers.  Both of his hands were wrapped around the sword's grip and were held out from his body between chest and neck high. In this posture, Mr. Hummell was clearly brandishing the sword at the officers.  Mr. Hummell began slowly moving toward the officers.

22. In response, Officer Rivera and Officer Camp drew and trained their weapons on Mr. Hummell.

7

23. Between the two officers, they issued several commands to Mr. Hummell, ordering him both to stop moving and to drop the sword. Mr. Hummell did not respond to the officers' commands, either by speaking, ceasing his forward movement, or lowering or dropping the sword.

    a. This finding is based upon the consistent testimony of both officers which the Court finds credible.

    b. The officers' testimony is further corroborated by the undisputed evidence that, earlier that day, Mr. Hummell had planned to commit "suicide by cop." Plaintiff claims that Mr. Hummell was not acting aggressively and would have complied with the officers' commands if only he had been given the opportunity. However, at the time of the shooting, Mr. Hummell was several steps down the road of his tragic plan. He had expressed the plan to his girlfriend through several text messages. He had composed a written suicide note. He had himself called the police department to report a raving man in an orange shirt with a long sword at his apartment complex. He had gone down to the parking lot with his sword wearing an orange shirt. He sat in his vehicle which was situated by the entrance to the apartment complex, waiting for the police to arrive. When they arrived, he waited until the officers were in close proximity to him before exiting his vehicle and pulling out the sword. He held the sword in front of him in a threatening manner. These facts are not reasonably in dispute. Certainly, it is possible that an individual could plan to commit suicide, take several steps to accomplish it, and

8

then turn away at the last moment.  Indeed, despite all the steps taken by Mr. Hummell in furtherance of his planned "suicide by cop," if he had simply stood still after exiting the vehicle, the officers would have had no cause to shoot him. He could have still turned away from his plan.  Plaintiff argues that Mr. Hummell did just that.  However, Mr. Hummell's commitment to his suicide plan -- and the number of steps he took to implement it -- makes it far more likely that, just as the officers testified, he took the last step and advanced toward the officers despite their commands.

c.  Ms. Terry testified that she heard only one command ("Put it down!") before the first shot was fired.  Mr. Gonzales testified that he heard only one command ("Don't move!") before the first shot was fired.  Plaintiff has argued that their testimony demonstrates that only one command was given and that Mr. Hummell did not have time to comply with that order before shots were fired.  The Court concludes otherwise.  First, the significant differences between the commands heard and remembered by Ms. Terry and Mr. Gonzales support the finding that the officers were issuing numerous and different commands which were directed at stopping both Mr. Hummell's forward movement and his brandishing of the sword.  Second, neither Ms. Terry nor Mr. Gonzales were paying attention to the events in the parking lot until the very moment of the shooting.  Consequently, it is unsurprising that they would have heard only the final commands even if other commands were given.

24. Given Mr. Hummell's refusal to comply with commands and his continued, albeit slow, advancement toward the officers, Officer Rivera determined that lethal force was necessary to protect himself and Officer Camp.  He fired his rifle at Mr. Hummell four times, three shots entering his torso and one hitting his hand.  At about the same time as Officer Rivera decided to employ lethal force, Officer Camp also concluded that lethal force was necessary because he was in fear for his life.  Officer Camp, however, did not fire his weapon because, at the crucial moment, his weapon was not confidently aimed at Mr. Hummell.  This was a result of having, moments before, taken his left hand off of his weapon to activate his radio.

25. Mr. Hummell fell forward and lay face down on the ground.  Officer Rivera directed Mr. Hummell to roll over.  Mr. Hummell complied and rolled onto his back.  Immediately thereafter, the officers moved the sword away from Mr. Hummell and handcuffed him.

26. At some point after Mr. Hummell was handcuffed, he passed away.  He died as a result of the gunshot wounds.

27. Officer Norman Rhoades of the New Mexico State Police crime scene team arrived at the scene later that morning.  He photographed and catalogued the scene including the locations of the vehicles and the shell casings.

III.   CONCLUSIONS OF LAW

1.  The Court has jurisdiction under 28 U.S.C. § 1331.

2.  Plaintiff brought this case pursuant to 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following:

10

a. Officer Rivera violated Mr. Hummell's Fourth Amendment rights by using excessive force when he shot Mr. Hummell;

b. Officer Rivera was negligent in violation of the New Mexico Tort Claims Act when he shot Mr. Hummell;

c. The City of Las Cruces is liable under § 1983 for failing to properly train and/or discipline Officer Rivera;

d. The City of Las Cruces is liable under the theory of respondeat superior for Officer Rivera's negligence.

**A.    Plaintiff's Federal Excessive Force Claim Against Officer Rivera**

1. 42 U.S.C. § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal quotation marks omitted).

2. The Fourth Amendment of the United States Constitution protects individuals against the use of excessive force, including deadly force, in the context of a seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989).

3. A seizure occurs for the purposes of the Fourth Amendment when a police officer makes a show of authority or applies force to an individual, thereby terminating the movement of the individual or causing him to submit to the officer's authority. *Brooks v. Gaenzle*, 614 F.3d 1213, 1223 (10th Cir. 2010).

4.  A police officer uses excessive force during a seizure if his actions were not

    "objectively reasonable in light of the facts and circumstances confronting [him]."

    *Graham*, 490 U.S. at 397 (internal quotation marks omitted); *see also Fisher v. City of Las*

    *Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).

5.  An evaluation of reasonableness requires a fact specific evaluation of the totality of the

    circumstances surrounding the event at issue, made from the perspective of "a

    reasonable officer on the scene," who is "often forced to make split-second judgments

    – in circumstances that are tense, uncertain, and rapidly evolving – about the amount

    of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97; *Thomson*

    *v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009).

6.  When evaluating the reasonableness of the officer's actions, the Court may consider,

    among other factors, (1) the severity of the crime in question, (2) whether the suspect

    posed an immediate threat to the safety of the officers or others, and (3) whether the

    suspect was actively resisting or attempting to evade arrest.  *Graham*, 490 U.S. at 396.

    The Court should also consider "whether the officers' own reckless or deliberate

    conduct during the seizure unreasonably created the need to use such force."  *Medina*

    *v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citation and internal brackets omitted).

7.  The Court finds that Mr. Hummell was seized when he was fatally shot by Officer

    Rivera.

8. The Court finds that Plaintiff has failed to show that Officer Rivera's use of lethal force was not "objectively reasonable in light of the facts and circumstances confronting [him]." *See Graham*, 490 U.S. at 397.

9. The facts and circumstances which lead the Court to this conclusion are as follows:

   a. When the officers were walking through the apartment complex's parking lot, Mr. Hummell confronted them by exiting his vehicle as they approached and pulling out a four-foot sword. This act was particularly aggressive given that the officers were approaching in uniform and one was visibly carrying an assault rifle. Moreover, the act of pulling the sword from the vehicle was the functional equivalent of withdrawing a sword from a sheath.

   b. Mr. Hummell, who was six feet, three inches tall, held the sword in a threatening fashion -- with two hands up and away from his body, tip skyward and the blade facing the officers. This posture is associated with a swordsman preparing to attack.

   c. The officers had been advised that the man with the sword was either "raving" or "irate."

   d. When the officers pointed their weapons directly at Mr. Hummell, he did not respond verbally nor did he lower the sword. Instead, Mr. Hummell slowly advanced on the officers.

   e.   When the officers ordered Mr. Hummell to stop and to drop the sword, he did not respond verbally nor did he lower the sword. Instead, Mr. Hummell continued to slowly advance on the officers.

   f.   None of Mr. Hummell's behavior reasonably indicated that he would comply with the officers' commands.

   g.   At the time of the shooting, Officer Rivera was no more than 27 feet from Mr. Hummell. Officer Camp was almost as close to Mr. Hummell as Officer Rivera.

   h.   Mr. Hummell's aggressive brandishing of the sword occurred in a residential area in the parking lot of an apartment complex of significant size which was in use at the time.

10.  Under these circumstances, the Court finds that, at the time of the shooting, Officer Rivera reasonably feared for his safety, the safety of Officer Camp, and the safety of citizens in the immediate vicinity should Mr. Hummell depart the parking lot.

11. Moreover, neither officer engaged in reckless or deliberate conduct that unreasonably created the need to use lethal force. In fact, the officers had been approaching Mr. Hummell in the vehicle because they thought he might be a witness to the individual carrying a sword. Instead, as soon as they began to approach, they were surprised to be confronted with a six foot three inch man who brandished a four-foot sword at them. Consequently, the officers were "forced to make [a] split-second judgment[] – in [a] circumstance[] that [was] tense, uncertain, and rapidly evolving – about the amount of force that [was] necessary . . . ." *Graham*, 490 U.S. at 396-97.

12. Under these circumstances, Officer Rivera did not use excessive force in his seizure of Mr. Hummell.

   **B.      Plaintiff's § 1983 Claim against the City of Las Cruces**

1. A governmental entity may be held liable for a failure to train police officers where: "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact[;] and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Thomson*, 584 F.3d at 1322 (*quoting Allen v. Muskogee, Okla.*, 119 F.3d 837, 841-42 (10th Cir. 1997)).

2. As discussed above, Plaintiff has not established by a preponderance of the evidence that Officer Rivera exceeded any constitutional limitation on the use of force.  Because Plaintiff fails to meet the first prong of the failure to train test set forth by *Thomson*, the Court declines to consider the remaining prongs.  The Court finds that the City of Las Cruces is not liable under § 1983.

### C.     Plaintiff's State Law Claims

1.  The New Mexico Tort Claims Act (NMTCA) expresses "the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."  N.M. Stat. § 41-4-2 (1978).  Under New Mexico law, a police officer may be liable for negligence that results in a specifically enumerated tort under the NMTCA.  *Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App. 1992).  Battery is a specifically enumerated tort for which there is a waiver of immunity under the NMTCA.  *See* N.M. Stat. § 41-4-12.

2.  A police officer will not be liable for battery so long as he acted in good faith and only used the force reasonably necessary under the circumstances.  *See Jonas v. Bd. of Comm'rs of Luna County*, 699 F. Supp. 2d 1284, 1297 (D.N.M. 2010) (*citing State v. Gonzales*, 642 P.2d 210, 213 (N.M. Ct. App. 1982)).

3.  For the same reasons discussed above, the Court finds that Officer Rivera acted in good faith and used reasonable force when he shot Mr. Hummell.  Consequently, Plaintiff's claim for negligence under a battery theory fails.

4.  A governmental entity "may be held vicariously liable for any alleged torts committed by the officers for which immunity has been waived [under the NMTCA]."  *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 916 P.2d 1313, 1318 (N.M. 1996).

5.   Because Officer Rivera is not liable for the tort of negligence under New Mexico law,

the Court also finds that the City of Las Cruces is not liable for negligence under the

doctrine of respondeat superior (vicarious liability).

**D.    Defendants' Motion In Limine to Exclude Robert Jones as an Expert is Granted**

1.   Prior to trial, Defendants moved to exclude the opinion testimony of Robert Jones.  *See*

*docs. 51, 52*.  Defendants argued *inter alia* that Mr. Jones was not sufficiently qualified

under Federal Rule of Evidence 702 to present an expert opinion as to the use of force

in this case.  *Doc. 52*.  Because this case involved a bench trial, the Court, without

objection from the parties, decided to permit Mr. Jones' testimony conditioned on a

ruling on his qualifications.  *Doc. 74*.  Having considered Mr. Jones' qualifications as

presented in his trial testimony, Defendants' motion will be granted.

2.   Federal Rule of Evidence 702 permits a witness to testify as an expert provided that

the witness meets the qualifications set forth in that rule.

3.   Before reaching the other requirements, the Court must determine if, by reason of his

knowledge, skill, experience, training, or education, the person proffered as an expert

is competent to express an opinion on the particular matter.  *See* FED. R. EVID. 702.

4.    Plaintiff bears the burden of demonstrating to the Court that the expert's "opinion is

based on facts which satisfy Rule 702's reliability requirements."  *Dodge v. Cotter Corp.*,

328 F.3d 1212, 1222 (10th Cir. 2003).

5.   Plaintiff has not met this burden.  Mr. Jones was a law enforcement officer for twenty-three years primarily with the Doña Ana County Sheriff's Office (DASO).  By the time he retired as a Captain in 2005, he had performed many functions.  During that time, he received the standard training received by all officers in proper police procedures including the use of force.   Between 1995 and 2005, he conducted internal affairs investigations and supervised the internal affairs division.  During some of that time, he also supervised the K-9 units employed by the sheriff's department.  At the end of his career, he also supervised the patrol division.

6.   While Mr. Jones' supervisory experience and internal affairs experience may be sufficient to qualify him as an expert in police procedures,[7] he lacks the experience necessary to qualify as an expert in use of lethal force.  Although he received use-of-force training commensurate with his fellow law enforcement officers, he has never trained other officers on the use-of-force, nor written any teaching materials or articles on the subject.  In fact, Mr. Jones has had no education or training in use-of-force models since his retirement in 2005.  This fact is particularly problematic where, as both parties made clear in this trial, such models are constantly evolving based upon new research and experience.  Despite his long tenure in internal affairs, Mr. Jones was

---

[7] While expert testimony on evidence of police standard operating procedures ("SOPs") in the context of excessive force cases is not *per se* inadmissible, there is "a very strong tendency to exclude such evidence on the basis of irrelevancy."  *Hernandez v. City of Albuquerque*, 1:02-cv-00333-JB-RHS (D.N.M. Jan. 21, 2004), doc. 294 at 9.  Where, as here, Plaintiff's expert has not cited a specific SOP for review, any expert testimony on SOPs that Mr. Jones could or did provide would be appropriately excluded as irrelevant. *Id.* at 10; *see also L'Esperance v. Mings*, 2003 WL 25692557, at *3-*4 (D.N.M. July 14, 2003).

involved in only two use-of-force investigations which were similar to the instant case. He conducted one of those investigations, but only assisted in the other.

7.  Furthermore, in his trial testimony, Mr. Jones was unable to explain the methodology he used to arrive at his opinions of the events in question.  In fact, Mr. Jones struggled to adequately explain any of the use-of-force methodologies which were discussed in the course of the trial.  Unsurprisingly, Mr. Jones has never been qualified as an expert witness in any court in a case involving an officer's use of lethal force.

8.  In short, Plaintiff has not demonstrated that Mr. Jones possesses the necessary knowledge, skill, experience, training or education to qualify as an expert under Rule 702.  The Court hereby grants Defendants' motion and excludes his testimony from its consideration of the evidence in this case.

9.  It should be noted that, even if the Court concluded that Mr. Jones edged over the line and was competent to testify as an expert, considering his opinion would not alter the result in this case.  Mr. Jones' opinion that the shooting in this case was not reasonable is based on an arbitrarily narrow view of the events in question.  As he repeated often, Mr. Jones focused on the fact that Mr. Hummell took "one simple step."  However, as the Court describes above, the aggression that Mr. Hummell displayed that day was not limited to a simple step.  As Mr. Jones' opinion is based on a premise rejected by the Court, the opinion itself must be rejected even if he were qualified to give it.

## IV.   CONCLUSION

Based on the foregoing, it is ordered that the Clerk of Court shall enter judgment in favor of Defendants as to each of Plaintiff's claims.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**